# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| JAMES WILLIAMS | * | |
| **Plaintiff** | * | |
| v. | * | CIVIL NO.  JKB-09-484 |
| RELIABLE CONTRACTING CO., INC. | * | |
| **Defendant** | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

James Williams, who is African American, brought suit pursuant to 42 U.S.C.A. §§ 1981 and 2000e-5(f)(1) (West 2003) against Reliable Contracting Co., Inc. ("Reliable"), for alleged employment discrimination.  (Paper No. 1.)  He also claimed breach of contract.  (*Id.*)  Reliable has moved for summary judgment.  (Paper No. 25.)  The issues have been briefed (Paper Nos. 29, 30, 32), and no hearing is required, Local Rule 105.6.  For reasons explained below, the Court will grant in part and deny in part Defendant's Motion for Summary Judgment (Paper No. 25).

### I. Standard for Summary Judgment

Generally, an award of summary judgment is proper in federal cases when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing

predecessor to current Rule 56(c)). The burden is on the moving party to demonstrate the absence of any genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine issue of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to defeat a defendant's motion for summary judgment. *Id.* at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine issue for trial, Fed. R. Civ. P. 56(e)(2). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Rule 56(e)(1).

## II. Background

### A. Factual Setting

Reliable is a Maryland corporation located in Anne Arundel County. (Paper No. 25 Supp. Mem. at 1.) It provides grading, utility, paving, and site development work. (*Id.*) Williams began working for Reliable in 1992 at age twenty as an hourly-wage laborer; he was promoted to a salaried position as a traffic foreman in 1997. (*Id.*; Ex. A, Reliable's Ans. to Int. at 2, 5; Ex. J, Williams Personnel File.) He received regular pay increases from the time of his hiring through 2006. (*Id.* Ex. A, Reliable's Ans. to Int. No. 8; Ex. J, Williams Personnel File.)

In his position as a traffic foreman, Williams was responsible for a crew of approximately two to seven people who managed traffic on job sites when Reliable was paving roadways. (*Id.* Supp. Mem. at 1; Ex. C, Williams Dep. 11:4-16.) Reliable considered Williams a valued employee; he was the most highly paid traffic foreman working for the company. (*Id.* Supp. Mem. at 1; Ex. D, Baldwin Aff. ¶ 4; Ex. E, Scrivener Dep. 39:14—40:4.) Until 2006, Williams had an excellent record at Reliable and performed his job well. (*Id.* Ex. A, Reliable's Ans. to Int. No. 5.)

In 2003, Williams first inquired about being promoted beyond his position as a traffic control foreman. (*Id.* Ex. C, Williams Dep. 19:11-16.) He suggested that the company create a position of superintendent of a traffic division. (*Id.* 20:3-5, 20:19—21:4.) John White, Paving Manager, and Robert Scrivener, General Manager, declined to act on the suggestion because they saw no need for such a position; Reliable does not have a traffic division. (Paper No. 25, Ex. B, White Dep. 45:14—47:7; Ex. E, Scrivener Dep. 61:20—62:6.)

Williams also believed he should be considered for promotion to "field project manager" so that he could work his way up to project manager and made inquiries along those lines. (*Id.* Ex. C, Williams Dep. 25:5-9, 26:5-9, 39:10-19.) The term "field project manager" was a term that Williams used to mean someone who would assist a project manager. (*Id.* 26:17—27:3, 29:1-6.) He specified another employee, Larry Oates, as having been employed in the type of position he had in mind. (*Id.* 27:4-19.) According to Reliable's files, Oates was hired as a crew leader in June 1994 in the paving division and was promoted to traffic manager, then to project foreman in 1999, and then to project manager in April 2005; the position of project foreman is also known as site superintendent. (*Id.* Ex. A, Reliable's Ans. to Int. Chart; Ex. D, Baldwin Aff. ¶ 5b.) White described Oates's position as "field foreman" or "field superintendent." (*Id.* Ex. B, White Dep. 27:12-15.) Williams regarded the work that he was doing, even though his job title

was traffic foreman, as equal to the work of a "field project manager," and he wanted the title to reflect his work duties. (*Id.* Ex. C, Williams Dep. 29:7—30:16.)

Open positions at Reliable were never posted internally. (*Id.* Ex. E, Scrivener Dep. 32:15—33:4; Paper No. 29, Ex. 1, Williams Aff. ¶ 2.) They might be advertised "in the Capital,"[1] or a "help wanted" sign might be posted at the plant. (Paper No. 25, Ex. E, Scrivener Dep. 32:15—33:2.) Williams never saw or heard of a list of formal qualifications for any position. (Paper No. 29, Ex. 1, Williams Aff. ¶ 2.) Before this litigation began, he never saw a list of job duties. (*Id.*) Williams knew of no procedures for applying for promotions; applications or résumés were not accepted. (*Id.*) No announcements were made of promotions. (*Id.*) Williams did not know what he should do to become qualified for the positions to which he sought promotion. (*Id.* ¶ 3.)

White said that when he was promoted from superintendent to paving manager, it happened without his asking for a promotion. (Paper No. 25, Ex. B, White Dep. 22:8-18.) Scrivener asked White if he would take the paving manager's position and then discussed with White who should fill the superintendent's position; White recommended that two people, Oates and Bill Midgett, fill his position. (*Id.* 25:12—26:9.) White said that Scrivener "knew they were next in line." (*Id.* 28:3-4.)

Scrivener described the process that preceded White's promotion from superintendent to paving manager:

> We talked – it's a small group, we always talk amongst ourselves and look for the best qualified people.

---

[1] The Court presumes that Scrivener was referring to the newspaper, The Capital.

(Paper No. 25, Ex. E, Scrivener Dep. 14:18-20.) When asked what the process was for promotions generally, Scrivener testified,

> Typically the manager would select – if you're hiring from within, we always look from within first if we can and see who's in line for promotion, who's best qualified. It depends on what jobs you have on line at the time, if you want to fill the position again. . . .

> . . .

> [I]t was very informal. . . .

> . . .

> It's a small company, a small division. We know what we need. If you have a vacancy in a foreman, you look around to see who's best suited. . . .

> . . .

> Typically in this case it would be my decision to hire a new project manager. I would talk amongst our existing project managers, superintendents if we need opinions. If you find somebody you like, you would try them.

(*Id.* 15:14—18:6.)

Statistically, the number of African-American employees (laborers and foremen) at Reliable in the years 2000 to 2009 has ranged from a low figure of 31 in 2009 to a high figure of 133 in 2003. (*Id.* Ex. A, Reliable's Ans. to Int. No. 6.) This number was 97 in 2005, 87 in 2006, and 73 in 2007. (*Id.*) African-American laborers represented a varying percentage of laborers at Reliable, ranging from 33.3% in 2009 to 58.9% in 2005. (*Id.*) This percentage was 42.47% in 2006 and 40.9% in 2007. (*Id.*) African-American foremen have constituted a less varied percentage of total foremen at Reliable; they represented a low figure of 9% of foremen in 2003 (7 total) and a high figure of 14.3% in 2005 (8 total). (*Id.*) These figures were 12.7% in 2006 (8 total) and 13.8% in 2007 (8 total). (*Id.*) During the years 2000 to 2009, Reliable had no African-American employees in the positions of project managers or superintendents. (*Id.*) Scrivener

testified that he could not recall Reliable's ever having an African American above the position of foreman since he began working there in 1978.  (Paper No. 25, Ex. E, Scrivener Dep. 9:8-9, 56:3-7.)   All project managers and superintendents at Reliable from 1995 to 2009 were Caucasian.  (*Id.* Ex. A, Reliable's Ans. to Int. Chart.)

Scrivener testified that Reliable had no policies as to the race of employees who could be promoted.  (*Id.* Ex. E, Scrivener Dep. 56:3-11.)  He further stated,

> At the time you have an opening you promote the best guy for the job or you hire somebody if you don't come up with one from within.

(*Id.* 56:11-13.)  When asked whether "the best guy for the job" had ever been a black employee, Scrivener said, "Apparently not."  (*Id.* 56:14-18.)  He acknowledged that, since his promotion in 2000, he had never recommended a black employee for a position higher than foreman.  (*Id.* 70:2-9.)

Reliable has said that Williams did not have the experience, communication skills, or management skills necessary to perform the job of field superintendent.  (*Id.* Ex. A, Reliable's Ans. to Int. No. 3.)  Additionally, Reliable has stated that Williams lacked the skills of a project manager, which requires the skills of a field superintendent and which necessitates being in charge of multiple projects.  (*Id.*)  However, Scrivener acknowledged that Reliable did not have formal qualifications for either of these positions.  (Paper No. 25, Ex. E, Scrivener Dep. 21:18—23:4.)  He indicated that advancement "depends on personalities, experience, leadership abilities, those kind [sic] of things."  (*Id.* 22:17-19.)  Scrivener described the qualifications for the position that Oates had as a site superintendent or a "field supervisor" as

> [s]omebody who has leadership capabilities, organized, knew the specifications for the kind of work he's working on, experience, able to work with subs, make the phone calls, coordinate the schedule, track quantities.

. . .

> You've got letters and stuff you've got to come up with, you know, nonperformance things for one of the subcontractors possibly.

(*Id.* 29:4-12.)

For a project manager's position, Scrivener said,

> You typically had to have a better knowledge of the plans and specifications, scheduling, coordinate subcontractors, trying to find subcontractors for a project.

(*Id.* 29:16-19.)

Reliable has a list of job duties and responsibilities for the positions, and these were first prepared in 2005. (*Id.* 22:5-6, 23:5—24:15.) Williams stated that he has done the vast majority of the job duties for these positions. (Paper No. 29, Ex. 1, Williams Aff. ¶¶ 3, 5.) He also stated that he had experience working in the grading department and the utility department of Reliable. (*Id.* ¶¶ 8-9.) White conceded that when he was promoted from foreman to superintendent, he did not have all of the experience required for his new position but he "was just put in the position and learned it from there." (Paper No. 25, Ex. B, White Dep. 20:8-9.)

Three Caucasian employees were promoted to the position of project manager in the paving department in 2005. (*Id.* Ex. A, Reliable's Ans. to Int. Chart.) In the grading department, four Caucasians were either promoted to or hired for the position of project manager in 2005. (*Id.*) In the utility department, one Caucasian was hired for the position of superintendent in 2005. (*Id.*)[2]

---

[2] Williams has also pointed out that the promotions or hires in these same departments before 2005 were Caucasians as well. (Paper No. 29 at 7-8.) For reasons later explained, the Court will focus on the comparable events in 2005 or afterward.

Williams believed that he was passed over for promotion in favor of Caucasians and became frustrated that he could not be promoted. (Paper No. 29, Ex. 1, Williams Aff. ¶¶ 1, 10.) Reliable has said that four incidents involving Williams in 2006 changed its view of him. (Paper No. 25, Supp. Mem. at 3; Ex. B, White Dep. 40:11-13, 41:1-6, 48:3-4; Ex. E, Scrivener Dep. 43:7—52:18.)

In one incident, Williams was flagging traffic on a job site and was bumped by a car; according to Reliable, Williams became angry, pulled a windshield wiper off the car, and got into an altercation with the driver. (*Id.* Ex. B, White Dep. 33:19—34:12.) Williams indicated in his deposition that he was hit by the car and somehow landed on the hood of the car and that as he jumped off the car, the windshield wiper, which he had been tightly gripping, came off in his hand; further, Williams said the driver got out of his car and swung at Williams. (*Id.* Ex. C, Williams Dep. 90:13—92:19.) Williams was not reprimanded for the incident. (*Id.* Ex. E, Scrivener Dep. 46:4-5, 46:17.) In a second incident, he had an argument with another employee in the truck shop, but Reliable felt that was a minor incident. (*Id.* 43:13—45:9.) He was not reprimanded for that incident, either. (Paper No. 29, Ex. 1, Williams Aff. ¶ 10.) A third incident involved Williams's allegedly getting angry and leaving a job site; since he was the certified traffic manager at the site, Reliable was "left hanging." (Paper No. 25, Ex. E, Scrivener Dep. 46:18—48:3.) No reprimand was given to Williams about the incident, which he disputes. (*Id.* 49:8-11; Paper No. 29, Ex. 1, Williams Aff. ¶¶ 10, 11.) In the fourth incident, Williams acknowledged that he got into an argument with another employee, whom he hit. (*Id.* ¶ 13.) Williams was suspended from work for a week without pay and lost some vacation pay. (*Id.*; Paper No. 25, Ex. E, Scrivener Dep. 54:6-20.)

In April 2007, Williams became impatient with what he viewed as the unfulfilled promises of White and Scrivener for him to move from the traffic division to become a detail foreman and with what he perceived to be their avoidance of him. (*Id.* Ex. C, Williams Dep. 108:6—109:20, 110:17—111:9.) To focus White's attention, Williams cut up his traffic manager's card and left the pieces on White's desk. (*Id.* 111:9-12, 114:15—115:10.) Scrivener gave Williams the next work day off until White could return to the office and they could discuss what to do. (Paper No. 25, Ex. E, Scrivener Dep. 65:1-3.) Scrivener and White spoke with Patricia Baldwin in Reliable's personnel department to get guidance on options. (*Id.* 65:18-20; Ex. H, Baldwin Dep. 6-8.)

White testified that Williams had said he was afraid to be in traffic (*Id.* Ex. E, Scrivener Dep. 63:17—64:1), and White relayed that information to Baldwin (*Id.* Ex. H, Baldwin Dep. 17:16-18), but Williams denied he ever said that (*Id.* Ex. C, Williams Dep. 110:5-10; Paper No. 29, Ex. 1, Williams Aff. ¶ 15). Acting on the belief that Williams was afraid to be in traffic, White, Scrivener, and Baldwin concluded that Williams could not continue to serve as a traffic foreman because it would be unsafe for him and unsafe for other employees. (Paper No. 25, Ex. A, Reliable Ans. to Int. No. 4; Ex. B, White Dep. 64:7-10, 66:12-14; Ex. E, Scrivener Dep. 63:18—64:1; Ex. H, Baldwin Dep. 17:18-21, 18:10-12, 19:6-9.)

Reliable did not have a foreman's position available in the paving division to which to transfer Williams. (*Id.* Ex. A, White Dep. 64:9-14, 65:8-11; Ex. H, Baldwin Dep. 20:15—21:10.) Some work was available as a detail foreman, but only part time. (*Id.* Ex. H, Baldwin Dep. 21:11-14.) Williams was offered the position of patch crew foreman, which he refused. (*Id.* Ex. H, Baldwin Dep. 21:10-11, 22:3-14; Ex. C, Williams Dep. 112:5-7.) Baldwin determined that the only available position for Williams was as a laborer in the utility division,

but that he had potential to work his way up in the division; however, transfer to that position required a cut in pay. (*Id.* Ex. H, Baldwin Dep. 23:3—24:1.) She told him that he would be better off if he found another job in maintenance of traffic. (*Id.* 24:6-9.)

Williams wrote a letter to explain his version of the events. (Paper No. 25, Ex. F, Williams Let. 4/16/2007.) He believed he had been wrongfully "discharged" from his foreman's position. (*Id.*) Williams stated he was given the option of being discharged from the company or being demoted. (*Id.*) He said he agreed to the demotion as a temporary position until either a reasonable discussion took place as to the agreement and reasons for discharge from his position, the original agreement was fulfilled, and/or he found another job at another company. (*Id.*) Williams has stated in his affidavit that Baldwin told him he would get the first foreman position when it opened; he said that, otherwise, he would never have left his position in the traffic division. (Paper No. 29, Ex. 1, Williams Aff. ¶ 17.) Williams also stated that, after his conversation with Baldwin, other foreman positions were given to other employees, and he indicated his belief that Baldwin had lied to him; consequently, he left Reliable. (*Id.*)

Baldwin responded to Williams's letter with a letter that also reflected her understanding of the meeting she and Williams had had. (Paper No. 25, Ex. G, Baldwin Let. 4/17/2007.) She stated that his unwillingness to continue to work in the traffic control division and the absence of other available positions did not leave Reliable with many options. (*Id.*) Thus, she offered him a skilled labor position in the utility division at an hourly rate, with future consideration of Williams for a skilled labor or other position in the asphalt division that might come available and for which he would be qualified. (*Id.*) She said it was not possible for him to be considered for a higher position at that time because no higher positions were available and because his recent performance suggested he was not ready for further advancement. (*Id.*)

In the letter, Baldwin highlighted his admission that he had cut up his traffic manager's card as well as "numerous acts" that not only reflected on Williams's qualifications for advancement but also "would otherwise warrant immediate termination." (*Id.*) Baldwin indicated that she and Williams had "discussed numerous instances of unsatisfactory performance, including violent actions toward other employees," but that Reliable would not take "further action against you at this time as a result of the previous instances – with the understanding that there will be no further acts of aggression by you in the workplace or toward your co-workers or others." (*Id.*) Thus, Baldwin said that Williams would not be discharged due to his "exhibited performance deficiencies." (*Id.*)

Before countersigning the letter, Williams struck out the two uses of the word "numerous," underlined the phrase "offered to and declined" in the sentence about the patch crew foreman's position, underlined the word "employees" in the sentence about violent actions, underlined "violent acts" near the end of the letter, and annotated the letter as follows:

> This was signed by me James Williams for which I have asked for reasons of why. I am not agreeing or disagreeing at ~~this~~ time of signing of letter. Patricia M. Baldwin was not being netural [sic] as I asume [sic] she would be. I just wanted to get my paper and leave.

(Paper No. 25, Ex. JW8, Baldwin Let. 4/17/2007.)

Williams said he underlined the phrase "offered and declined" because the patch crew foreman's position was not offered as a promotion. (*Id.* Ex. C, Williams Dep. 131:12-18.) He underlined "employees" because he said that he had only one incident with one employee involving a violent act. (*Id.* 131:19—132:2.) For the same reason, he underlined "violent acts" on the second page. (*Id.* 132:3-9.)

After that, he went into the utility division, but felt that he had been given a punishment first by being demoted and then by not getting his annual pay raise; he learned about the latter in June 2007. (*Id.* 134: 10-16, 135:20—136:1.) After fifteen years with the company, he felt he was being pushed out and that it was time for him to go. (*Id.* 134:16—135:4.) He decided he would look for a job and give two weeks' notice. (*Id.* 135:4-5.) He resigned his position on June 11, 2007, and the last day Williams worked for Reliable was June 24, 2007. (Paper No. 29, Ex. 1, Discrim. Charge; Paper No. 25, Ex. A, Reliable's Ans. to Int. Nos. 12, 13.)

## B. *Procedural History*

On July 23, 2007, Williams filed a charge of employment discrimination with the Maryland Commission on Human Relations ("MCHR") and Equal Employment Opportunity Commission ("EEOC"). (Paper No. 32, Ex. 1.) He alleged that Reliable had discriminated against him on account of his race (African American). (*Id.*) Williams raised the issues of terms and conditions of employment, demotion, suspension, wages, and constructive discharge. (*Id.*) He indicated that the dates of harm were January 1, 2007, through June 11, 2007. (*Id.*) Williams stated,

> I have been employed with the above named employer since 1992. For several years I have been inquiring about promotional positions within the company. I have observed that Caucasian are [sic] considered and granted promotions faster than African American. I believe that since I was in a supervisory position I was overlooked and therefore treated differently because of my race. On April 9, 2007 I was suspended and demoted to a skilled laborer's position. This came several days after I spoke with Patricia Baldwin regarding a promotion. I was not given a reason for the demotion. I became frustrated because no one was willing to discuss the matter with me. I noticed that I was being treated differently by management staff. On June 11, 2007, I felt I had no other choice but to submit my resignation.

(*Id.*)

MCHR investigated Williams's complaints and found an absence of probable cause to believe that Reliable had discriminated against him. (Paper No. 32, Ex. 2.) MCHR denied his request for reconsideration. (*Id.* Ex. 3.) EEOC issued a notice of dismissal and right to sue on December 4, 2008. (*Id.* Ex. 4.) Williams filed the instant lawsuit on February 26, 2009 (Paper No. 1), within the ninety-day limitation period for suits brought pursuant to 42 U.S.C. § 2000e-5(f)(1).

### III. Analysis

#### A. Jurisdiction – Summary Judgment Granted on Count One

The Court generally has jurisdiction for the claims under the applicable federal statutes and the pendent state law claims. Nevertheless, the precise scope of the claims that can be adjudicated must be addressed.

The Supreme Court has clarified that claims under 42 U.S.C. § 1981(a) relating to formation of a contract are properly brought in federal court if they fall within the applicable statute of limitations of the forum state. *Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369, 371-73 (2004) (interpreting 1991 amendment to Section 1981 in light of holdings of *Goodman v. Lukens Steel Co.*, 482 U.S. 656 (1987), and *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989)). But post-formation conduct arises under Section 1981(b), and the four-year statute of limitations found in 28 U.S.C. § 1658 governs those claims. 541 U.S. at 383; *James v. Circuit City Stores, Inc.*, 370 F.3d 417, 421 (4th Cir. 2004).

The claims raised by Williams are based on post-formation conduct. Hence, conduct that may be at issue under Section 1981 must have occurred on or after February 26, 2005, which is four years before the date when his lawsuit was filed.

Williams has also sued under 42 U.S.C. § 2000e-5(f)(1). Proceeding under this statute, however, requires administrative exhaustion of the complaints made in the lawsuit. If the claims made in a judicial complaint are reasonably related to a plaintiff's EEOC charge and if they can be expected to follow from a reasonable administrative investigation, then those claims may be included in the subsequent lawsuit. *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000). *See also Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300-01 (4th Cir. 2009) ("'Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit.'" (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996))). The description of the conduct in the EEOC charge must parallel the conduct described in the judicial complaint. *See Chacko v. Patuxent Institution*, 429 F.3d 505, 506 (4th Cir. 2005) ("We hold that a plaintiff fails to exhaust his administrative remedies where, as here, his administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit.").

Williams's administrative charge was restricted to the time period of January 1, 2007, through June 11, 2007. Thus, any conduct by Reliable that is subject to the instant suit under Section 2000e-5 must have occurred during that time period. Williams's complaint included two counts under Section 2000e-5: Count One, race discrimination in promotion, and Count Three, race discrimination causing constructive discharge. Williams's administrative charge mentioned his allegation that Caucasians were favored in promotions over African Americans but did not indicate specific incidents that should be considered as acts of discrimination and did not state that he had been denied promotion; his charge also included his allegation of constructive discharge. MCHR focused only on Williams's allegations of demotion and constructive

discharge and did not include in its written findings any mention of discrimination in promotions. (Paper No. 32, Ex. 2.) The Court concludes that Williams exhausted the second of the two counts currently before it that are brought pursuant to Section 2000e-5. That is, he did not exhaust his count of race discrimination in promotion (Count One), but he did exhaust his count of race discrimination based on his alleged constructive discharge (Count Three). However, because the claim of race discrimination in promotion under Count Two is cognizable under Section 1981, the Court has jurisdiction to entertain it regardless of exhaustion. The Court will grant Reliable's motion for summary judgment on Count One.

### B. Alleged Racial Discrimination in Promotions – Summary Judgment Denied on Count Two

Reliable has moved for summary judgment, arguing that Williams has failed to establish a prima facie case for racial discrimination in promotion. (Paper No. 25 at 5.) Under either Section 2000e-5 (Count One, already disposed of) or Section 1981 (Count Two), a plaintiff who has no direct evidence of discrimination may show a prima facie case under the "burden shifting" framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th Cir. 2005). Williams has not presented any direct evidence of discrimination and, therefore, must rely on circumstantial proof. A prima facie case of discrimination is based on a plaintiff's showing that (1) he is a member of a protected class, (2) he applied for a position, (3) he was qualified for that position, and (4) he was not selected for the position under circumstances that give rise to an inference of unlawful discrimination. *See Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1129 (4th Cir. 1995).

Reliable argues that Williams has not presented a prima facie case, although it concedes the first prong and the second prong – the latter because the company did not always require employees to apply for promotion. (Paper No. 25 at 6.) *See Williams v. Giant Food Inc.*, 370 F.3d 423, 431 (4th Cir. 2005) (if employer fails to make its employees aware of vacancies, application requirement may be relaxed and employee may be treated as if he or she had actually applied for specific position). As to the third prong, Reliable contends Williams has only presented self-serving comments that he was qualified for promotion. (*Id.*) Finally, with regard to the fourth prong, it contends Williams has failed to show that Reliable's multiple decisions not to promote him were based on racial discrimination. (*Id.*) Thus, as to Count Two, Reliable views Williams's claim as based upon alleged, intentional, discriminatory treatment rather than upon disparate impact, to which Williams alludes by highlighting Reliable's completely subjective system and criteria for promotions (Paper No. 29 at 15-20).

Here, it must be noted that a disparate-impact claim may be brought under Title VII as set forth in 42 U.S.C.A. § 2000e-2. A claim such as that in Count Two under Section 1981, however, requires proof of intentional discrimination, and disparate impact is not sufficient to prove discriminatory intent. *See General Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 383-91 & nn.8 & 17 (1982). Even so, the nature of Reliable's subjective promotion system may have some evidentiary value in evaluating Williams's claim of disparate treatment.

Thus, in considering the elements of the prima facie case, it must be determined whether Williams has presented evidence on the third prong that he was qualified for the positions to which he sought promotion. Reliable has presented uncontroverted evidence that it did not consider him qualified for any job beyond that of traffic foreman. This belief is reflected in the testimony of Scrivener (Paper No. 25, Ex. E, Scrivener Dep. 67:7-9, 71:13—72:20) and White

(*id.* Ex. B, White Dep. 28:5-12, 29:2-10, 47:8-11, 48:15-19) as well as affidavits from other supervisory employees at Reliable, Z. Meade Turner, manager of the grading division (Paper No. 30, Ex. K), and Michael Abbott, manager of the utilities division (*id.* Ex. L).  (*See also* Paper No. 25, Ex. A, Reliable's Ans. to Int. Nos. 3-4, 10-11.)   In sum, Williams's experience was, in Reliable's view, too limited for promotion and was clearly inferior to that of other employees whom they considered qualified.

Williams has attacked Reliable's evidence as to his lack of qualifications by pointing out the completely subjective nature of the company's criteria and methods utilized in the promotion process.  He has relied upon cases from other circuits for the proposition that a plaintiff need only show that he or she satisfied an employer's objective qualifications to establish a prima facie case.  *See Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768-69 (11th Cir. 2005) ("the prima facie case is designed to include only evidence that is objectively verifiable and either easily obtainable or within the plaintiff's possession"); *Johnson v. Louisiana*, 351 F.3d 616, 624 (5th Cir. 2003) (relying upon *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 681 (5th Cir. 2001) ("an employee must demonstrate that he meets objective hiring criteria at the prima facie case stage, and the issue of whether he meets subjective hiring criteria is dealt with at the later stages of the analysis")); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003) ("At the prima facie stage, a court should focus on a plaintiff's objective qualifications to determine whether he or she is qualified for the relevant job.").  The *Vessels* case noted other circuits agreed with this proposition.  408 F.3d at 769 ("[S]ubjective evaluations play no part in the plaintiff's prima facie case.  Rather, they are properly articulated as part of the employer's burden to produce a legitimate race-neutral basis for its decision, then subsequently evaluated as

part of the court's pretext inquiry.") (citing cases from Third, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and D.C. Circuits).

Following these cases, the Court concludes that the complete absence of objectively verifiable promotion criteria, as was the case at Reliable, favors rather than defeats a plaintiff's prima facie case. Consequently, it must be assumed that Williams met the qualifications for the positions at issue, thus satisfying the third prong.

The fourth prong is also deemed satisfied given that all of the people promoted beyond the position of foreman at Reliable during the time in question were Caucasian. *See Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994) (to satisfy fourth prong of prima facie case, plaintiff need only show that position was filled by someone outside of protected class). Therefore, the burden shifts to Reliable to articulate a legitimate, nondiscriminatory reason for not selecting Williams for promotion. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000).

An employer is given considerable leeway to make employment decisions, as long as they are not premised upon discriminatory intent. Here, Reliable has produced uncontroverted evidence that it believed it promoted the most qualified people to the positions at issue, i.e., project manager or superintendent, and that Williams's qualifications were sorely lacking. It has backed up that belief by showing evidence of the backgrounds and qualifications of those promoted. The Court is mindful of the Fourth Circuit's admonition in *DeJarnette v. Corning Inc.*, 133 F.3d 293 (4th Cir. 1998):

> While reviewing the employer's articulated reasons for discharge and the plaintiff's refutation thereof, we must keep in mind that "Title VII is not a vehicle for substituting the judgment of a court for that of the employer." Particularly, this Court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination . . . ." Our sole concern is

> whether the reason for which the defendant discharged the plaintiff was discriminatory. Thus, when an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.

*Id.* at 298-99 (internal citations omitted) (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410-11 (7th Cir. 1997)).

Williams argues that Reliable's evidence on this point is inadmissible because it is "hearsay" and because it is not based upon documentation contemporaneous with the decision-making. (Paper No. 29 at 21.) Williams has cited no authority that would render the deposition excerpts and the affidavits in Reliable's motion and reply inadmissible. Thus, Reliable's legitimate, nondiscriminatory reason stands. The burden now falls upon Williams to show "'by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Reeves*, 530 U.S. at 143 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S 248, 253 (1981)). This final inquiry "merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256.

Williams says that Reliable's articulated reason is false because evidence shows that he was equally or more qualified than any of the people who were promoted to project manager or site superintendent. (Paper No. 29 at 24, 34.) Williams's argument on this point is based on his conclusions derived from comparing himself to the others. (*Id.* at 34-37.) However, it is clear that Williams's own testimony cannot establish a genuine issue of whether he was as qualified or more qualified than another individual. "It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Evans*, 80 F.3d at 960-61 (internal quotation marks omitted), *quoted in King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003).

To prove pretext otherwise, Williams primarily relies on evidence that proves, he asserts, Reliable did not promote him because of racial discrimination. (Paper No. 29 at 24.) First, Williams argues that Reliable's use of an informal, subjective promotion system was a cover for racial discrimination. Second, he points out that all of the promotions or hirings to the positions of project manager and superintendent were Caucasian. Third, he asserts that Reliable's admission that it considers for promotions those who are "next in line" is only a cover for racial discrimination. Fourth, he argues that no contemporaneous evidence indicates that qualifications were taken into account in making promotion decisions. Fifth, he contends that Reliable's reaction to his act of cutting up his traffic manager's card supports his discrimination claim relating to promotion.

Although he has cited cases that call into question the neutral intent of subjective promotion systems, Williams has not cited any cases that *per se* condemn such practices as sufficient proof of a discriminatory intent. Every case appears to turn on its own facts. Further, a number of the cases on which Williams relies are not good precedent for the instant case. For example, *United States v. Bethlehem Steel Corp.*, 446 F.2d 652 (2nd Cir. 1971), was based upon the parties' stipulation of discrimination. That clearly has not occurred here. Other cases were "disparate impact" cases, unlike this case, which may only succeed upon proof of discriminatory intent. *See Sledge v. J.P. Stevens & Co., Inc.*, 585 F.2d 625 (4th Cir. 1978); *Brown v. Gaston County Dyeing Mach. Co.*, 457 F.2d 1377 (4th Cir. 1972). The case of *Page v. Bolger*, 645 F.2d 227 (4th Cir. 1981), cited by Williams because the Fourth Circuit "rejected as pretext the Company's principal assertion that it perceived the white promotees better qualified than the black plaintiffs, and held that race was the determining factor in each adverse promotion decision" (Paper No. 29 at 26), has been grossly mischaracterized. The Court actually affirmed

the lower court's decision that the Postmaster General's stated reason for not promoting the plaintiff was not pretextual.  645 F.2d at 230.

This is not to say that the Court can give its blessing to Reliable's subjective, informal promotion system.  It is a detriment, in the Court's view, to Reliable's efforts to show that its practices were racially neutral.  But it also does not compel a conclusion that it is, as Williams chooses to characterize it, "a cover for racial discrimination."  It is, then, some evidence to consider on the question of discriminatory intent.

Williams also relies statistically on the complete absence of African Americans from the positions of project managers and superintendent.  Certainly, statistical evidence may be useful in divining an employer's intent, although the Supreme Court has cautioned, "The District Court may, for example, determine, after reasonable discovery that 'the (racial) composition of defendant's labor force is itself reflective of restrictive or exclusionary practices.'  We caution that such general determinations, while helpful, may not be in and of themselves controlling as to an individualized hiring decision, particularly in the presence of an otherwise justifiable reason for [the adverse employment decision]."  *McDonnell Douglas Corp. v. Green*, 411 U.S. at 805 n.19 (citations omitted).  Williams couples the statistical evidence here with the subjective promotion system and concludes that such "is a sure fire way of showing discrimination." (Paper No. 29 at 29).  He cites the *Sledge* case as authority for this evidentiary combination, but that was a disparate-impact case and, thus, not dispositive of Williams's own disparate-treatment case.  As with the first factor, however, it is some evidence that deserves consideration.

Reliable's informal method of considering the person who is "next in line" is also thought by Williams to be damning evidence of code words for "the next preferred Caucasian person." This is effectively a jury argument on how to interpret testimony.

Williams has argued that it is improper for Reliable to assemble evidence and to state its opinions about past promotional decisions when it maintained no contemporaneous documentation of the decision-making that accompanied those decisions. (Paper No. 29 at 32.) Thus, Williams concludes that a fact-finder should infer Reliable intended to discriminate against African Americans at the time of the promotions. This, also, deserves consideration on the question of discriminatory intent.

Last, Williams points to the events of April 2007 as evidence of Reliable's discriminatory intent. These will be additional matters for the fact-finder. The Court's duty is to determine if sufficient evidence has been presented to create a genuine issue of material fact. As the Supreme Court has stated, the question is "whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson v. Liberty Lobby*, 477 U.S. at 252. The Court concludes that, although Williams has not presented a strong case, sufficient evidence nevertheless exists to go to a jury on the question of whether Reliable violated 42 U.S.C. § 1981 in its promotional decisions. Reliable's motion will be denied on Count Two.

### C. *Constructive Discharge – Summary Judgment Granted on Counts Three and Four*

This claim was properly exhausted and, therefore, is considered under Section 2000e. It is also properly before the Court under Section 1981.

The Supreme Court has observed,

Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes. The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?

*Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004).

Williams has apparently conceded this issue because he has neither argued it nor presented evidence to support his claim. Given the evidence before the Court, it must be concluded that Williams has not made even a plausible claim of constructive discharge. His statements to MCHR, in his deposition, and in his affidavit, recounted *supra* and not repeated here, show only dissatisfaction with his not being promoted and with his demotion. Such dissatisfaction does not rise to the level of "intolerable working conditions," as described in the *Suders* opinion. Therefore, on Counts Three and Four, the Court will grant Reliable's motion for summary judgment.

### D. Breach of Contract – Summary Judgment Denied on Counts Five and Six

Williams claims that he was promised a promotion to project manager or superintendent numerous times between 1995 and 2007 (Count Five), that he was promised a promotion to foreman in April 2007 (Count Six), and that Reliable failed to keep its promises. Reliable cites Maryland case law for the proposition that an enforceable oral contract must have definite terms. *See Yost v. Early*, 589 A.2d 1291, 1300-01 (Md. Ct. Spec. App. 1991) (addressing issue of oral contract for alleged, lifetime employment). The record before the Court contains Williams's averments that Reliable promised him a promotion. (Paper No. 25, Ex. C, Williams Dep. 110:17—111:4; 112:11-12; Paper No. 29, Ex. 1, Williams Aff. ¶ 17.) The Court considers this to be more than a scintilla and, thus, sufficient to create a genuine dispute of material fact. Whether Williams's proof rises beyond vague intentions to the level of an enforceable oral contract is a matter for the jury to consider. The Court will deny Reliable's motion for summary judgment on Counts Five and Six.

### IV. Conclusion

The Court concludes that a genuine issue of material fact exists as to Counts Two, Five, and Six in this case. The issues for trial are these two:

- Whether Reliable's failure to promote Williams was based on discriminatory intent, and

- Whether Williams and Reliable had an enforceable oral contract for Williams to be promoted either to a project manager or superintendent's position prior to April 2007 or to foreman following Williams's April 2007 demotion.

Accordingly, summary judgment for Defendant Reliable will be granted in part and denied in part by separate order. The Court OVERRULES Plaintiff Williams's objections to Reliable's evidence in support of its motion for summary judgment.

Dated:     April 26, 2010                     /s/

James K. Bredar
United States Magistrate Judge